## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CARMY M.,[1] | ) | |
| | ) | No. 19 CV 4032 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| ANDREW M. SAUL, Commissioner of | ) | |
| the Social Security Administration, | ) | |
| | ) | September 10, 2020 |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER

Carmy M. seeks disability insurance benefits ("DIB") based on her claim that she is disabled by depression, anxiety, and chronic pain. This is Carmy's second lawsuit stemming from her DIB claim. Her first case resulted in a remand order sending her claim back to an administrative law judge ("ALJ") for further proceedings. On remand, the assigned ALJ again denied Carmy's claim, and she filed this lawsuit seeking a second round of court review. Before the court are the parties' cross-motions for summary judgment. For the following reasons, Carmy's motion is granted, the government's is denied, and the case is remanded for the second time:

### Background

Carmy first sought DIB following a workplace injury in August 2011, but her claim was denied in April 2014. (Administrative Record ("A.R." 18).) In July 2014

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the claimant's first name and last initial to protect her privacy to the extent possible.

Carmy filed a second DIB application, claiming a new disability onset date of April 17, 2014—the day after the ALJ denied her first claim.[2]  (Id.)  Following a hearing in April 2016, the ALJ denied Carmy's second DIB claim in May 2016.  Thereafter the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  *Jeske v. Saul*, 955 F.3d 583, 597 n.2 (7th Cir. 2020).  Carmy then filed a lawsuit seeking review.  *See* 42 U.S.C. § 405(g).

The court in the first case remanded the matter for further proceedings after concluding that the ALJ failed to adequately support her decision to discount a treating psychiatrist's opinion that Carmy's depression and anxiety seriously interfere with her ability to perform full-time work.  (See A.R. 638-42.)  In a decision issued in November 2017, the court noted that the ALJ discounted the treating psychiatrist's opinion based only on perceived inconsistencies between that opinion and the medical findings and course of treatment.  (Id. at 756.)  However, the ALJ failed to articulate why the findings undermine the treating psychiatrist's opinion and overlooked parts of the medical record showing that Carmy's symptoms were more than just moderate.  (Id. at 757.)  The court further noted that the ALJ failed to explain her conclusion that Carmy's psychiatric treatment was conservative and failed to articulate how other mental health providers' conclusions undermine the psychiatrist's opinion.  (Id. at 759-60.)  For these reasons, the court remanded the case for a re-evaluation of the psychiatrist's opinion, without addressing Carmy's

---

[2]  To prevail on her second DIB application Carmy must show that she was disabled in the period between April 17, 2014, and December 31, 2016, which is her date last insured.  (A.R. 791.)

arguments that the ALJ's assessment of her residual functional capacity ("RFC") was unsupported and that the ALJ improperly discounted her subjective symptom allegations. (Id. at 767.)

Following the first remand order, the ALJ held two hearings, (id. at 1221, 1251), and then issued a decision in April 2019 again denying Carmy's DIB claim, (id. at 804). In the second decision the ALJ engaged in the requisite five-step analysis, *see* 20 C.F.R. § 404.1520(a), finding at step one that Carmy had not engaged in substantial gainful activity in the period between her alleged disability onset date and her date last insured. (A.R. 791.) At step two the ALJ determined that Carmy has the severe impairments of affective and anxiety-related disorders, osteopenia, arthritis, and chronic pain. (Id.) At step three the ALJ concluded that none of those impairments meets or equals any listed impairment. (Id. at 791-92.)

Before turning to step four, the ALJ assessed Carmy as having the RFC to perform sedentary work with non-exertional limitations including "no more than simple, routine and repetitive tasks, in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, with few, if any, workplace changes [and] rare if any, interaction with the public, and occasional interaction with supervisors." (Id. at 794.) In explaining that assessment the ALJ again discounted the treating psychiatrist's opinion, providing additional details to support her finding that the opinion is inconsistent with the medical findings and course of treatment. (Id. at 800-01.) The ALJ also concluded that Carmy's subjective allegations are inconsistent with the record, faulting her for failing to

follow through with treatment recommendations and describing her as having a "tendency" to exaggerate her symptoms. (Id. at 799, 802.) At step four the ALJ determined that Carmy is unable to return to any of her past relevant work, but at step five the ALJ concluded that Carmy's RFC would allow her to perform other jobs that exist in significant numbers in the national economy. (Id. at 802-04.)

When the Appeals Council did not assume jurisdiction over the ALJ's remand decision, it became the Commissioner's final decision. *See* 20 C.F.R. § 404.984(d). Carmy then filed this lawsuit seeking review of the ALJ's second decision, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 7).

## Analysis

Carmy raises a slew of arguments challenging the ALJ's decision, falling into three main categories: (1) the ALJ violated the law of the case doctrine on remand; (2) the RFC assessment is unsupported by substantial evidence; and (3) the ALJ's evaluation of her subjective symptoms is insufficiently explained and unsupported by the record. In reviewing the ALJ's decision this court analyzes whether the decision is free from legal error and supported by substantial evidence. *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). "'Substantial evidence' means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation marks and citation omitted)). Although this standard of review restricts the court from reweighing the evidence or substituting its judgment for the ALJ's, the court will reverse an ALJ's decision "if the evidence does not support the

4

conclusion," the decision is based on "serious factual mistakes or omissions," or the ALJ fails to "build an accurate and logical bridge between the evidence and the result." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

## A.    Law of the Case Doctrine

Carmy argues that the ALJ violated the law of the case doctrine by failing to reanalyze the opinion of her treating psychiatrist, Dr. Susanna Kovari, as required by the first remand order. Carmy asserts that the ALJ echoed the same reasons she offered in her original decision without considering the factors that the court said should be addressed on remand. Those factors include documentation of severe (in addition to moderate) mental health symptoms, the waxing and waning of Carmy's symptoms, and the severity of her symptoms even when she experiences periods of improvement or stabilization. (R. 18, Pl.'s Br. at 11.) The government responds that the law of the case doctrine has very limited application in the social security context and asserts that it is not this court's role to dictate how the ALJ weighs the evidence. In the government's view, so long as the ALJ's analysis of the evidence on remand does not repeat verbatim the previous analysis, there is no violation of the law of the case doctrine. (R. 25, Govt.'s Br. at 4-5.)

The law of the case doctrine applies to judicial review of administrative decisions and requires an administrative agency to conform its decision to the principles set out in a court's remand order. *See Wilder v. Apfel*, 153 F.3d 799, 803 (7th Cir. 1998). But this doctrine is triggered only where the court has actually decided a particular issue and "[i]f an issue is left open after remand, the lower

tribunal is free to decide it." *Surprise v. Saul*, 968 F.3d 658, 663 (7th Cir. 2020) (quotation and citation omitted). For example, a "ruling that evidence was insufficient to support some finding is the type of ruling that establishes the law of the case." *Wilder*, 153 F.3d at 803. On the other hand, where a court's ruling instructs the ALJ to build a logical bridge that had been missing, the law of the case doctrine does not apply. *See Pearline P. v. Saul*, No. 17 CV 8996, 2020 WL 370187, at *3 (N.D. Ill. Jan. 22, 2020). In other words, if the court's directive to the ALJ is to provide a more thorough analysis, the law of the case doctrine would not prevent the ALJ from relying on the same evidence when unspooling it with more thorough explanation on remand. *See id.*

As the government points out, the court did not say that specific evidence is insufficient *per se*, but rather found that the ALJ failed to sufficiently articulate and explain her reasons for finding evidence inconsistent with Dr. Kovari's opinion. Specifically, the court determined that the ALJ "failed to point to evidence to support her conclusion that Dr. Kovari's treatment notes show mild improvement and stabilization," "did not articulate" why "vague and limited findings" of stabilization and improvement in Dr. Kovari's notes undermine her opinion, "did not articulate why Claimant's GAF score undermines Dr. Kovari's opinion," and failed to "point to evidence to support her conclusion" that treatment was conservative. (A.R. 758-60.) The court made it clear that a remand was necessary for the ALJ to provide for a better articulation of "the essential logical connection between the evidence and the limited weight she assigned Dr. Kovari's opinion."

(Id. at 762.)  Accordingly, the law of the case doctrine did not bar the ALJ from relying on the same evidence or providing similar reasons on remand, so long as she followed the court's directive to build a more robust nexus between that evidence and her conclusions.  *See Surprise*, 968 F.3d at 663.

The ALJ followed that directive here.  Although it is true that the ALJ again rested her decision primarily on inconsistencies between Dr. Kovari's opinion and notes, this time she provided additional analysis to shore up her conclusion. Specifically, the ALJ pointed to specific symptoms Dr. Kovari reported in her opinion that are found nowhere in her notes, including sleep disturbance, recurrent panic attacks, and recurrent and intrusive recollection of past trauma.  (Compare A.R. 28 with id. at 800.)  The ALJ pointed out that, according to Dr. Kovari's notes, the first report of a trauma flashback came after Dr. Kovari issued her opinion (and after Carmy's date last insured), and that Carmy reported that she has nightmares, but they do not disturb her sleep.  (Id. at 800.)  The ALJ also noted that Dr. Kovari's opinion linked Carmy's changes in her weight to appetite disturbance, even though her records attribute weight gain to medication side effects.  (Id. at 801.)  The ALJ further explained Dr. Kovari's observation that Carmy's symptoms will wax and wane are not borne out by her notes, which show the same findings over the course of her visits except for slight exacerbations with specific life stressors.  (Id.)  These new explanations are sufficient to support the ALJ's decision to give Dr. Kovari's opinion only "some weight" and to prioritize the findings in Dr. Kovari's contemporaneous notes over the form she prepared in support of Carmy's DIB

claim.  Because the ALJ fleshed out her analysis in a manner sufficient to build the logical bridge that had been missing from her initial decision, the court finds no reversible error in her handling of Dr. Kovari's opinion on remand.

**B.    Symptom Assessment**

The court next addresses Carmy's argument that the ALJ erred in discounting her subjective symptom statements—an argument she raised but the court did not resolve in her first lawsuit—because an erroneous symptom evaluation often undermines the entire undergird of the RFC assessment.  *See Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014) (noting that an erroneous credibility determination requires remand unless the remainder of the ALJ's decision does not depend on it).  An ALJ's appraisal of a claimant's description of her symptoms is entitled to special deference and will be overturned by the court only where it is "patently wrong."  *Murphy v. Colvin*, 759 F.3d 811, 815-16 (7th Cir. 2014).  That said, "when a credibility finding rests on objective factors or fundamental implausibilities, rather than on a claimant's demeanor or other subjective factors," the court has wider latitude to review the assessment.  *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (internal quotation omitted).

Carmy first argues that the ALJ's use of a familiar boilerplate phrase suggests that the ALJ applied an impermissibly stringent standard.  Specifically, Carmy objects to the ALJ's observation that Carmy's statements are "not entirely consistent" with other record evidence, arguing that this phrase demonstrates that she held Carmy's testimony to more than the applicable preponderance of the

evidence standard. (R. 18, Pl.'s Br. at 17.) Carmy's argument on this point is unpersuasive. The court agrees with the decisions in this district that have held that even though the cited boilerplate language is problematic, the problematic phrase will be overlooked so long as the ALJ provides a sufficient explanation for how the claimant's statements are weighed. *See, e.g., Clemente A. v. Saul*, No. 18 CV 6345, 2019 WL 3973117, at *3 (N.D. Ill. Aug. 22, 2019); *Mendel R. v. Berryhill*, No. 17 CV 5407, 2019 WL 1858510, at *8 (N.D. Ill. April 25, 2019); *Dawn P. v. Berryhill*, No. 17 CV 4707, 2019 WL 339603, at *4 (N.D. Ill. Jan. 28, 2019). Further, the Seventh Circuit has treated similar boilerplate language in which an ALJ writes that a claimant's statements are "not entirely credible" as run-of-the-mill template language, upholding those decisions so long as they are fully explained. *See, e.g., Hammerslough v. Berryhill*, 758 Fed. Appx. 534, 539 (7th Cir. 2019); *Lafayette v. Berryhill*, 743 Fed. Appx. 697, 699 (7th Cir. 2018). Here the ALJ gave a number of reasons for the symptom assessment, and although the court ultimately concludes that those reasons are unsupported, the ALJ's use of this common boilerplate language does not convince the court that the ALJ applied the wrong standard.

Turning to the ALJ's substantive reasons for the symptom assessment, Carmy argues that the ALJ relied too heavily on a lack of objective evidence without fully explaining the perceived inconsistencies between her complaints and the record evidence. The ALJ primarily concluded that Carmy's physical symptoms are not as severe as alleged because those symptoms are "inconsistent with the

9

objective medical evidence showing no more than mild to moderate physical findings." (A.R. 798.) An ALJ may not discount pain testimony solely because it cannot be confirmed by objective medical evidence. *See Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015).

Here the emphasis the ALJ placed on a perceived mismatch between Carmy's pain description and the objective medical evidence is especially problematic given her express acknowledgement that Carmy's doctors attributed her physical pain at least in part to her mental health problems. (A.R. 796-97, 802.) In particular, Carmy saw a physiatrist who opined that she was suffering from "severe diffuse pain due to severe depression, which is not currently managed." (Id. at 796.) Although the ALJ described the objective evidence as showing only mild to moderate disc disease and other examination results in the normal range, (id. at 797), she did not explain what objective evidence she would expect to support chronic pain that she acknowledged has an origin, at least in part, in mental health struggles. The ALJ's failure to explore or explain the inconsistency on which she pinned much of her credibility decision casts that aspect of the symptom assessment into significant doubt.[3] *See Beardsley*, 758 F.3d at 838 ("[W]ithout some attempt by

---

[3] Moreover, even if Carmy did not report to her doctors "that she experiences pain so intense that she needs to lie down several times a day and recline about six or seven times daily, as she testified," (A.R. 798), the records show that Carmy did report not being able to do much because of pain "all over," (id. at 364-65), that by the end of the day her pain is so bad it feels like she has been "run over by a truck," (id. at 696), and that she could not even "sit in bed" after minimal activity, (id. at 1005).

the ALJ to explore the supposed contradictions here, they do not provide a sound basis for concluding that [the claimant's] report was inaccurate.").

Equally troubling is the fact that the ALJ faulted Carmy for failing to follow through with recommended treatment without exploring the reasons for that failure. In particular, the ALJ found that Carmy's symptoms are not as severe as she portrayed because she "is doing little to improve her symptoms." (A.R. 798.) As an example, the ALJ pointed to Carmy's acknowledgement that eight sessions of aqua therapy helped her, and then faulted her for failing to continue with the therapy. (Id.) The ALJ noted that cost contributed to Carmy's failure to follow through with aqua therapy, but in no way factored that explanation into the symptom assessment or explained why her failure to continue aqua therapy shows a lack of commitment to treatment given the financial barrier. (Id.) It is well-established that an ALJ commits reversible error where she holds a lack of treatment against a claimant without exploring the reasons for the lack of follow-through. *See Ray v. Berryhill*, 915 F.3d 486, 490-91 (7th Cir. 2019) (noting that an ALJ "may not draw inferences about a claimant's lack of treatment without exploring the reasons for the inaction"); *Beardsley*, 758 F.3d at 840 (same). Despite acknowledging Carmy's financial barrier, here the ALJ did exactly that.

Carmy also argues that the ALJ erroneously relied on the idea that she avoided recommended treatment, such as participating in more activities, without considering how mental illness impeded her ability to participate. As an initial matter, the ALJ fixated on two notes from June 2013 in which a doctor reported

Carmy's concern that engaging in some activities could negatively impact her then-pending DIB claim and that a lawyer had advised her not to engage in volunteer activities. (A.R. 799 (citing id. at 479, 498).) But those reports predate her current alleged disability onset date and were made about six years before the ALJ issued her decision. The ALJ pointed to no evidence from the relevant period suggesting Carmy avoided activity for reasons other than depression and pain. Moreover, the ALJ faulted Carmy for failing to engage in activities that doctors suggested could improve her mood and mental health, specifically citing as an example Carmy's failure to engage with adult coloring books after stating that would be an activity she might enjoy. (Id. at 799.) Nowhere in this discussion does the ALJ factor in how Carmy's depression and anxiety would impact her ability and motivation to engage in such activities. Carmy reported to her doctors that her depression made it difficult for her to participate in any leisure activities, (id. at 630), but the ALJ overlooked that evidence in holding her inactivity against her. The ALJ has an obligation to consider how mental health problems contribute to a lack of treatment follow-through. *See McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir. 2010) (reversing where ALJ "evinced no recognition that [the claimant's] psychiatric disorder might interfere with her ability to follow a proper regimen for alleviating her physical ailments"); *see also Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (reversing where ALJ failed to consider impact of mental health on ability to follow through with treatment). The ALJ failed to meet that obligation here.

12

Finally, the reasons the ALJ gave to explain her "questions as to claimant's reliability as a witness" are also problematic. (A.R. 799.) As an initial matter, the ALJ may not reject a claimant's description of her symptoms because she concludes that the claimant's character suggests dishonesty. *See* SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017); *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (noting that ALJs are not "in the business of impeaching claimants' character"). The ALJ's skepticism as to Carmy's "reliability as a witness" hovers on the border of that kind of error. Moreover, the two examples that she gave to support that conclusion lack support.

First, the ALJ found that Carmy's insistence at the hearing that treatment had not improved her mental health was inconsistent with records reflecting at least some improvement toward progress goals. (A.R. 799.) It is true that the records the ALJ cited in her decision reflect that Carmy had a good response to medication. (Id. at 798.) But the ALJ did not explain how those notes contradict Carmy's testimony that her condition has not improved. (Id. at 799, 1231-32.) In other words, Carmy may have had a good response to medication and, at the same time, subjectively felt as though her depression and anxiety were deteriorating. Moreover, the ALJ overlooked other records describing Carmy's response to treatment in the relevant period as being "poor." (See, e.g., id. at 390, 394, 399, 403.)

The other example the ALJ gave as an indicator of unreliability was Carmy's testimony "that she has done nothing outside the home for the last few years other

than aqua therapy and family gatherings," despite the fact that mental health records showed that she "dat[ed] an old friend and ma[de] other efforts at online dating." (Id. at 799.) The ALJ's explanation here is a reach. There is nothing in the records to suggest that Carmy was leaving her house to date anyone on a regular basis. If anything, the records reflect that in October 2015 Carmy went on one date with a man she reconnected with online. (Id. at 598, 602, 610.) The ALJ did not build any kind of logical bridge between Carmy's failure to mention her extremely limited dating experience and the conclusion that Carmy has a "tendency to somewhat overstate her condition." (Id. at 799.)

Standing alone, none of these flaws in the ALJ's symptom assessment renders the decision unsupported. But taken together, these problems cast substantial doubt on the ALJ's analysis. Accordingly, and because the ALJ's symptom analysis was a significant factor in the RFC determination, a second remand is required. *See Pierce*, 739 F.3d at 1051.

## C. The RFC Assessment

Carmy also challenges the ALJ's assessment of her RFC on numerous fronts, beginning with an assertion that the ALJ rejected all of the medical opinions and then just "split the difference" among them to determine her RFC, without pointing to additional evidence to support the idea that she can perform sedentary work. (R. 18, Pl.'s Br. at 12.) Contrary to Carmy's assertion, the ALJ did not reject all of the medical opinions. The ALJ addressed those opinions and gave them varying weight based on her analysis of their supportability. There is no requirement that

the ALJ must fully adopt any one opinion or choose among them in developing an RFC assessment, because that task is specifically left to the ALJ alone. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007); 20 C.F.R. § 404.1546(c). Where, as here, the ALJ explains how she weighs varying medical opinions and then generates an RFC assessment based on that weighing process, there is no "splitting the difference" problem. *See Green v. Saul*, 781 Fed. Appx. 522, 529 (7th Cir. July 23, 2019). Accordingly, Carmy's argument is unpersuasive in this respect.

That said, there are two aspects of the ALJ's RFC analysis that give the court significant pause. As Carmy points out in detail in both her opening and reply briefs, the ALJ failed to consider the combined impact of her obesity and pain. The government failed to address this argument anywhere in its brief, effectively waiving any response. *See Bonte v. U.S. Bank*, 624 F.3d 461, 466 (7th Cir. 2010). An ALJ is required to consider a claimant's obesity because "[t]he combined impact of obesity with other impairments may be greater than might be expected without obesity." SSR 002-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002).[4] Even if obesity is considered a non-severe impairment, the ALJ is obligated to consider its combined impact with the claimant's severe impairments.

The ALJ here did not mention obesity in the RFC discussion or consider its potential impact on Carmy's severe impairments of arthritis and chronic pain.

---

[4] On May 20, 2019, the Social Security Administration rescinded SSR 02-1p and replaced it with SSR 19-2p. *See* SSR 19-2p, 2019 WL 2374244, at *1 (May 20, 2019). The new SSR also requires the ALJ to consider the combined impact of obesity and other impairments. *Id.* at *2. However, SSR 02-1p was the applicable rule at the time the ALJ issued her decision in April 2019.

Instead the ALJ addressed obesity only at step two, where she acknowledged that a body mass index ("BMI") greater than 30 is considered obese, and then concluded that Carmy's obesity is non-severe.  (A.R. 792.)  In explaining that conclusion, the ALJ wrote:

> [a]lthough it appears that at times during the relevant adjudicatory period claimant may have exceeded the threshold for clinical obesity, the record does not support finding that this had any significant impact on her ability to perform basic work activity.

(Id.)  The ALJ's equivocation over whether Carmy "at times . . . may have exceeded the threshold for clinical obesity" is concerning given the clear evidence that Carmy in fact exceeded that threshold for months during the relevant period.  Specifically, doctors recorded Carmy as having a BMI above 30 in September 2015 (BMI of 32.6), November 2015 (BMI of 33.11), May 2016 (BMI of 36.05), August 2016 (same), and September 2016 (same).  (Id. at 698, 685, 1008, 1024, 1034.)  Even if Carmy's obesity and weight gain were related to her medication, the ALJ pointed to no evidence that this condition was temporary or resolved, and records from 2017 show that Carmy's BMI was even higher that year than during the relevant period.  (Id. at 1050.)  Moreover, at her 2018 hearing Carmy testified that she had lost 50 pounds, but even then, the weight she reported put her BMI at the cusp of the obesity threshold.  (Id. at 1227.)  The ALJ's analysis that Carmy "may have" been obese during the relevant period overlooks this evidence demonstrating that she clearly was obese.  The government might have argued that the ALJ's error here was harmless, but the court declines to reach that conclusion where the government failed to address Carmy's argument.  Had the ALJ considered the combined impact

of obesity and Carmy's arthritis (which the ALJ concluded is a severe impairment) she may have assessed Carmy's RFC differently. *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004); *Hughes v. Berryhill*, No. 17 CV 5468, 2017 WL 3647112, at *2-*4 (N.D. Ill. Aug. 1, 2018). Accordingly, the ALJ must correct this error on remand.

Similarly, Carmy argues that the ALJ erroneously failed to consider the combined impact of her depression and anxiety on her pain and vice versa. An ALJ is required to consider how mental and physical impairments interact with each other in evaluating a claimant's RFC. *Knapp v. Berryhill*, 741 Fed. Appx. 324, 329 (7th Cir. 2018). Although the ALJ here acknowledged that there is evidence that Carmy's pain complaints are influenced by her mental health condition, (A.R. 800, 802), she provided no explicit analysis of how depression and anxiety impact and interact with her arthritis and chronic pain. The ALJ should provide that analysis on remand.

The remainder of Carmy's arguments are best left for the ALJ to consider on remand. For example, to the extent Carmy argues that the assigned RFC fails to capture her limitations in concentration, persistence, or pace, the ALJ will need to reassess those limitations after reconsidering her symptom descriptions and analyzing the combined impact of her mental and physical impairments. Also, to the extent Carmy argues the RFC fails to accommodate how her crying jags would impact her ability to stay on-task (another argument the government failed to address in its response), whether such an accommodation is necessary will turn on

17

the ALJ's symptom assessment. Accordingly, those aspects of Carmy's arguments cannot be resolved in this action.

## Conclusion

For the foregoing reasons, Carmy's motion for summary judgment is granted, the government's is denied, and the case is remanded for further proceedings consistent with this opinion. Carmy's request that the court award her DIB is denied because an award of benefits is appropriate only in the "extraordinary circumstance" where the record supports only a conclusion in favor of the claimant. *See Martin v. Saul*, 950 F.3d 369, 376 (7th Cir. 2020). That is not the case here.

ENTER:

_____

**Young B. Kim**
**United States Magistrate Judge**